**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **DONYA MITCHELL,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | 5:03-CV-157 (WDO) |
| | : | |
| **MICHAEL OVERBEY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

Plaintiff Donya Mitchell sued Butts County, the Butts County Sheriff's Department[1],

Gene Pope, the Sheriff of Butts County, and Michael Overbey, a Major in the Sheriff's

Department, alleging sexual harassment, violations of the First and Fourteenth

Amendments to the United States Constitution, 42 U.S.C. §§ 1983, 1985, Title VII, the

Equal Pay Act, the Americans with Disabilities Act and  various state laws.  The matter is

now before the Court on the Defendants' motion to dismiss and motion for summary

judgment.

---

[1]In the Original Complaint, Plaintiff named Major Overbey, Sheriff Pope and the Sheriff's
Department as Defendants.  In the First Amended Complaint, Plaintiff named Major Overbey, Sheriff Pope
and Butts County, Georgia as Defendants, asserting the same claims.  On March 16, 2005, the parties
filed a "Consent Motion and Order Dismissing Defendant Butts County, Georgia Without Prejudice."  See
R. at 52.  Prior thereto, Sheriff Pope filed a motion to dismiss on behalf of himself and the Sheriff's
Department.  After the consent motion to dismiss the County, none of the parties filed any pleadings or
briefs on behalf of or in reference to the County or the Sheriff's Department.  The Court will therefore
assume that the parties intended to dismiss both Butts County and the Butts County Sheriff's Department
and that any pending claims are against Major Overbey and Sheriff Pope.

### *Factual and Procedural Background*[2]

In 1992, Plaintiff Donya Mitchell applied for employment with the Butts County Sheriff's Department. She was hired in March of 1993 after Defendant Sheriff Pope was elected. Mitchell worked in a clerical position for approximately two months and was later assigned to the jail where she worked for two years. The following facts, detailed chronologically to the extent possible, are the facts that the Plaintiff contends support her numerous claims against the Defendants.

During the time that Mitchell worked in the jail, she was approached by Deputy "Lump" Bennett who indicated he could help Mitchell "get on the road" because he was good friends with the Sheriff. During this conversation, he allegedly rubbed Plaintiff Mitchell's leg. On another occasion, Bennett urinated in front of Mitchell and made references to her about his ability to perform sexual acts. On one occasion when they were riding together, Bennett reached over and put his hand on Mitchell's leg and then on Mitchell's crotch area. Mitchell claims that she struggled to remove his hand. On another occasion when the two had a disagreement over whether to issue a citation to a truck driver, Mitchell became upset and told Bennett to not put his hands on her again.

Mitchell complained about Bennett to Chief Deputy Larry Welch. Welch and Sheriff Pope immediately investigated the matter. When Sheriff Pope asked to talk to Mitchell

---

[2] The Defendants filed a motion objecting to some of the evidence submitted with Plaintiff's response brief. Because this matter is before the Court on a summary judgment motion and all of the facts are construed in the Plaintiff's favor, the Court will decline the Defendants' request to exclude any evidence at this time. Most of the facts alleged in the disputed material simply expound upon the allegations in the Complaint. Although the Court will disregard any statement or fact that Mitchell or anyone else "believed" to be true, as opposed to something based upon personal knowledge, the Court will otherwise take the entire record into consideration. For the record, the Defendants dispute a majority of the allegations presented by Mitchell, particularly in regard to what Overbey did and said to Mitchell. However, because the matter is before the Court on summary judgment, the Court will construe all facts in Mitchell's favor where there is any dispute.

about her side of the story, Mitchell informed the Sheriff that she would prefer to make a statement to Welch since she believed Bennett to be the Sheriff's best friend. Mitchell claims that during this conversation Sheriff Pope yelled at her to go home. While Bennett was being questioned about his actions toward Mitchell, he admitted to what he had been accused and apologized. When Mitchell was asked what she would like to see come of the investigation, Mitchell stated that she did not want Bennett to be punished but wanted him to apologize and for the matter to be concluded. The Sheriff had Bennett write Mitchell an apology and attend counseling.

In 1995, Mitchell completed police academy training and was promoted to the Patrol Division. In December of 1997, Mitchell informed Sheriff Pope that she was interested in being promoted to the Criminal Investigation Division ("CID"). Sheriff Pope's version is that he and Major Overbey approached Plaintiff Mitchell about a promotion into the CID. Mitchell contends that Pope "warned her" about working with Major Overbey. Mitchell stated that she could "handle" Overbey and was told to let Overbey's comments "go in one ear and out the other." Mitchell was later informed that she was going to be promoted to the CID effective January 1, 1998. When Mitchell began to work in the CID, the CID staff consisted of Major Overbey, Sergeant Robert Smith and Plaintiff Mitchell. Major Overbey was one of Mitchell's supervisors.

In December of 1998, Mitchell began experiencing severe pain in her hands and an inability to fully use her hands. She was diagnosed and treated for rheumatoid arthritis and had surgery to remove blockages in February and March of 1999. She was later diagnosed with Beurger's disease, which was caused by an allergic reaction to nicotine.

In December of 1999, Major Overbey tried to kiss Mitchell at a party held at the

3

home of an individual after the Sheriff's Department's Christmas party.  Overbey allegedly became hostile at Mitchell for refusing his attempt to kiss her and called her a "frigid bitch." Mitchell later informed Chief Deputy Welch about the incident.  Several days later, Overbey commented to Mitchell about her running away from him at the party and asked her if she was scared of him.

At some point, Major Overbey opened the door to the women's bathroom at the Sheriff's Department, while Plaintiff Mitchell was using the bathroom, and flipped the lights off and on.  Mitchell complained and a latch was installed inside the bathroom door.

Another incident involved the Department policy of assigning employees to work armed robbery detail for two weeks in December for extra pay prior to Christmas.  While working on this assignment in December of 1999, Mitchell was approached by Major Overbey in his car and they spoke about Overbey's divorce.  During the two-week detail, Overbey would occasionally stop by the location where Mitchell was working.  On some of those occasions, he commented that Mitchell "must be working out" and "sure did look fine."  Mitchell complained to Smith and Welch about Overbey showing up on her robbery details, although Mitchell concedes that Overbey was her supervisor and it was part of his duties to supervise all of the deputies out on patrol.

Beginning in January of 2000, Overbey parked at the end of Mitchell's driveway on several occasions.  Overbey would pull into the driveway and sit in the car but would not approach the house.  Mitchell contends that on some of those occasions Overbey was intoxicated and Mitchell would have her son drive Overbey home.  During one of the times that Mitchell's son drove Overbey home, Overbey allegedly told Mitchell's son that Overbey loved his mother.

4

After one of those incidents, Mitchell threatened to resign because she was feeling stress from her interactions with Overbey.  Overbey specifically asked her not to resign and said, "it won't happen anymore."  Thereafter, Overbey began parking in her driveway again.  Mitchell complained to Chief Deputy Welch and threatened to resign.  Welch allegedly told Mitchell that nothing could be done unless Mitchell caught Overbey on tape because Pope and Overbey were good friends.

In March of 2000, Mitchell was scheduled to attend a conference on child abuse in Huntsville, Alabama because her area of investigative responsibility included child abuse and domestic violence.  Overbey attended the conference with Mitchell.  Upon their arrival, they discovered the hotel had only prepared one room for the first night and Overbey slept on the floor of Mitchell's hotel room.  Mitchell stated that "nothing happened" and that Overbey behaved on that particular occasion.  The following evening, Overbey asked Mitchell to join him and several other conference attendees in the hotel hot tub.  Mitchell declined and stated that she was going to turn in for the evening.  Overbey followed her to her hotel room and asked her what was wrong with her and why did she not want to join the others in the hot tub.  Overbey then called her a "frigid bitch."  Mitchell claims that she threw apples at Overbey until he left the doorway of her hotel room.  The next morning Mitchell called Overbey and told him that one of them had to leave the conference because she did not want to stay there with him and that if he did not leave she would call Sheriff Pope or Chief Deputy Welch.  Overbey started to cry and said he would "be good." However, Overbey left and Sergeant Smith was sent in his place.

Upon her return, Mitchell was scheduled to attend polygraph school in September of 2000.  When she learned that Overbey was planning to attend with her, she sought to

5

find a way to get out of going.  When she spoke to Welch about the matter, he rescheduled the training to April of that year.  At that time, Mitchell allegedly informed Welch that she was concerned about retaliation due to her rejection of Overbey.  When Mitchell left for polygraph school, she was away from the office for ten weeks.  There was no contact between Overbey and Mitchell during that ten-week period.

Upon Mitchell's return, Overbey commented about Mitchell's clothes, suggesting that she wear a particular pair of jeans and saying that her "ass sure did look fine."  He also stated that upon Mitchell walking into a room he became aroused.  On another occasion, Overbey stood on his toes to look down Mitchell's shirt.  On another, he rubbed against Mitchell, whispered in her ear inquiring whether she recognized a particular song and put his arm across her chest.  On one occasion, Overbey chased Mitchell around the office.  On another, Overbey picked Mitchell up by placing one of his arms under Mitchell's crotch and the other arm on Mitchell's shoulder.  Overbey once called Mitchell and asked if she was dressed or naked.  He simulated "humping" a female employee of the Sheriff's Department.  He referred to a magistrate judge by stating "the bitch ain't got no panties on. What she needs is some of this," and, while grabbing his crotch stated, "She just needs one good f***ing."  Overbey on several occasions stated that Sheriff Pope was a "big-eared pencil dick motherf***er."  Mitchell claims that several Sheriff's Department employees complained about Overbey's comments regarding the Sheriff.  Overbey sat in his office and stared at Mitchell on several occasions.  One day when he was out of the office, Mitchell had her desk moved out of his line of vision.  At one point, several Sheriff's Department employees met to discuss morale in the Department.  One of the complaints the employees had was that Overbey was a "micro manager."  Chief Deputy Welch said he

6

would try to help but his "hands were tied" and he could not get anything done about Overbey's management style because the Sheriff would not listen to Welch.

In 2001, Sergeant Smith was promoted to Lieutenant.  Mitchell contends that she was also considered for the promotion, that Overbey was to make the selection and that on one occasion had stated, "if you want this sergeant job, you know what you can do." No one was ever promoted into Smith's former position.

At some point, Overbey asked Mitchell if she was going to sue him for sexual harassment.  Mitchell told him that she was not.  In June of 2002 when he asked this again, she stated, "I haven't yet, have I?"  Mitchell was also allegedly told that Overbey had been overheard saying if you have sex with someone that person cannot sue you for sexual harassment.

Chief Deputy Welch eventually resigned from the Butts County Sheriff's Department.  After his resignation, Overbey allegedly asked Mitchell, "what are you going to do now?  You don't have your buffer any more."  Mitchell then complained about Overbey's comment to another Major in the Department, Sandra Thurston.

In the early part of 2002, Mitchell left the Department on FMLA leave because of her medical condition and returned to work in May of 2002.  In June of 2002, Mitchell requested personal leave to attend a district attorney's conference with her husband.[3] There arose a dispute regarding whether Mitchell had any leave hours remaining and her request for leave was denied.  The individual who had been responsible for calculating leave for the entire Department had incorrectly recorded everyone's leave and everyone

---

[3]Mitchell's husband, Paul Hemmann, was an Assistant District Attorney for the Towaliga Judicial Circuit, which includes Butts County.

ended up with less leave than they thought they had accumulated.   No one in the Department ever had that leave time restored.  Also in June of 2002, Overbey distributed name tags for new crime scene vests.   No name tag had been ordered for Mitchell. Overbey's explanation was that the Department did not expect her to return from medical leave.

That same month, Overbey assigned Mitchell to work an eviction case.  Mitchell claims that CID officers only worked felony cases and that the eviction case was not a felony case.  Later that month when Mitchell was on call, Overbey allegedly directed her away from a scene and sent another investigator.

Mitchell alleges that before Welch left the Department he had promised to give her a certain office to use for her polygraph equipment.   Mitchell alleges that Overbey prevented her from getting the office.  However, that particular office was used for storage and was never assigned to anyone.

On Sunday, June 30, 2002, employees of the Sheriff's Department were offered an opportunity to work a security detail for a July 4th party hosted by Jack Galardi, a resident of Butts County.  Galardi owns several strip clubs and hosts an annual July 4th party that is attended by the women who work in his clubs.  Galardi also hosts an annual charity golf tournament that is attended by his employees.  Around that time, Major Overbey, while in the office, described a previous golf tournament held by Galardi where his employees had inserted golf balls into their vaginas and ejected the balls back onto the ground.  Because Mitchell was not feeling well, she did not attend the July 4th, 2002 party and did not report to work the following Monday.  On Tuesday, she was informed that Sheriff Pope and Major Overbey wanted to speak with her.  Overbey allegedly stated that he "could have pinched

8

[Mitchell's] head off" for not working the day of the Galardi party.  This was apparently said prior to Mitchell walking into Sheriff Pope's office.  Overbey also stated that the "Sheriff hates what he's fixing to have to do."  When Mitchell walked into the Sheriff's office, he questioned her about being "AWOL" from work on Monday and noted that her absence was recorded as a "supervisory discussion."  Sheriff Pope informed her that she would have to leave work on FMLA leave for the balance of her available leave and that during that time Mitchell needed to get her health issues in order before she returned from FMLA leave because the next time she was out without leave she could be suspended and terminated any subsequent times.  At this point, Mitchell had exhausted all of her available 12 weeks of FMLA leave.  Mitchell informed the Sheriff that she needed to be out of work once every eight weeks for an intravenous treatment for her arthritis.  Mitchell then left the Sheriff's office.  Mitchell claims that she resigned thereafter to avoid being terminated which she believed would have caused her to lose her health insurance benefits through COBRA.[4]

Based on the above allegations, Plaintiff makes the following claims against Defendants Major Overbey and Sheriff Pope: (1) that she was subjected to sexual harassment and a hostile work environment, depriving her of her equal protection rights as provided by the Fourteenth Amendment; (2) that she was discriminated against,

---

[4]Mitchell also claims that her husband's resignation from the D.A.'s office was brought about because of pressure he received related to Mitchell's resignation.  However, those facts are not pertinent to any issues before the Court in this case.  Mitchell's husband is neither a party to this case nor has he attempted to join the case to assert a claim.  Second, any claim relating to him was not part of the EEOC charge and may not be asserted in this case as it pertains to a "new act of discrimination" and he resigned from working for a different employer.  Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989).  Finally, the record indicates that Mitchell's husband was fired for *threatening* the Sheriff not for complaining about any alleged discrimination against Plaintiff Mitchell.  R. at 80, Ex. 2.  The Court will therefore disregard any claims Mitchell may be attempting to assert on behalf of or related to her husband.

harassed and threatened based on her complaints about Overbey and the working environment in the Sheriff's Department, which she alleges is actionable pursuant to 42 U.S.C. § 1983; (3) that she was the target of a conspiracy to deprive her of her equal protection rights based on her gender and in retaliation for her complaints, which she alleges is actionable pursuant to 42 U.S.C. § 1985; (4) that she was sexually harassed and forced to work in a gender-based hostile work environment in violation of Title VII; (5) that her disabilities were not accommodated in violation of the Americans with Disabilities Act; (6) that she was compensated less than male employees in violation of the Equal Pay Act; (7) that the conspiracy to deprive her of the above rights brought about her constructive discharge; (8) that she was intentionally and recklessly injured due to the conspiracy carried out by Sheriff Pope and Major Overbey; (9) that she suffered physical injury resulting from the negligence of Sheriff Pope and Major Overbey; and (10) that she was intentionally assaulted and battered by Major Overbey.

### *Standard of Review*

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Supreme Court explained the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine

issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23.  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact."  Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  Id. (citation omitted).

### Timeliness of Claims

Defendants contend that not all of the discriminatory acts alleged by Plaintiff Mitchell should be considered because they occurred, if at all, outside the time frame of her EEOC charge.   Mitchell contends that all of the acts should be considered based on the "continuing violation" theory.

The Supreme Court has rejected the application of the continuing violation doctrine in hostile work environment cases.  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003) (citations omitted).  At one time, courts "distinguished between the present consequences of a one-time violation and the continuation of the violation into the present to determine whether a court could consider acts that occurred before the filing period for the purposes of determining liability."  Id. (citing Thigpen v. Bibb County, Ga., Sheriff's Dep't, 223 F.3d 1231, 1243 (11th Cir.2000)).  However, the Supreme Court has simplified "the limitations inquiry in hostile work environment cases.  The Court instructed that a

hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice,' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" Id. If, after the employee complains of the alleged discrimination and the employer promptly conducts an investigation and takes any action necessary to see that the discriminatory conduct ceases, a court may find that the "intervening action" by the employer cut off the time period of the alleged "hostile work environment." Id. at 1258-59.

In the case at bar, there was an intervening act by the Sheriff as to the "Lump" Bennett matter because an investigation was promptly and effectively conducted. Any claims related to him will not be considered in relation to whether this suit was timely filed. However, in relation to matters involving Defendant Overbey, Mitchell did not file a grievance or otherwise request an investigation. The Sheriff's Department therefore did not have an opportunity to take any "intervening action." Plaintiff's "constructive discharge" was in August of 2002 and the Complaint was filed on May 16, 2003. The Complaint was therefore filed within 180 days of the last allegedly discriminatory act and the Court will consider all of the allegations pertaining to any acts by Defendant Overbey and Defendant Pope.

### Sexual Harassment Claim

Plaintiff Mitchell's 42 U.S.C. § 1983 claim of hostile work environment sexual harassment involves the same elements as her Title VII discrimination claim and will therefore be considered together. Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, n.11 (11th Cir. 2000) (citation omitted). Second, although there is no individual liability

under Title VII for Sheriff Pope or Major Overbey, <u>Busby v. City of Orlando</u>, 931 F.2d 764, 772 (11th Cir.1991), the Sheriff is potentially liable as Mitchell's former "employer" pursuant to <u>Welch v. Laney</u>, 57 F.3d 1004, 1010 (11th Cir. 1995).  The Court will therefore consider whether the Sheriff is liable for a "hostile work environment" as alleged by Plaintiff Mitchell.

To establish a hostile work environment, a plaintiff must "show harassing behavior 'sufficiently severe or pervasive to alter the conditions of their employment.'" <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 124 S. Ct. 2342 (2004) (citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67, 106 S. Ct. 2399 (1986); <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22, 114 S. Ct. 367 (1993) ("The very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad rule of workplace equality.")).  To establish 'constructive discharge,' the plaintiff must further show that the abusive working environment became so intolerable that her resignation qualified as a fitting response. <u>Suders</u>, 542 U.S. 129.

"[A]n employer is strictly liable for supervisor harassment that culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." <u>Id.</u> at 2349 (citing <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257 (1998) and <u>Faragher v. Boca Raton</u>, 524 U.S. 775 (1988)).  "But when no tangible employment action is taken . . . the employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence:  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities

13

provided by the employer or to avoid harm otherwise." Id. (citations omitted).  "[A]n employer does not have recourse to the Ellerth/Faragher affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment." Id.

Plaintiff Mitchell alleges that her work environment was so discriminatory that she was "constructively discharged" and forced to resign from the Butts County Sheriff's Department.  The Court must therefore determine whether the working conditions were so intolerable that Plaintiff was in fact constructively discharged or whether there was no tangible employment action in which case the Court will be required to determine whether the Defendants are entitled to the Ellerth/Faragher affirmative defense.

"To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (citation omitted).  "Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal 'civility code.'" Id. (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02 (1998) ("We have never held that workplace harassment, even harassment between men and women,

is automatically discrimination because of sex merely because the words used have sexual content or connotations."); <u>Faragher</u>, 524 U.S. 775 ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'")).

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." <u>Id.</u> at 1246 (citation omitted). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that 'a reasonable person would find hostile or abusive' and that the victim subjectively perceives to be abusive." <u>Id.</u> (citations omitted). "Furthermore, 'the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Id.</u>

The Supreme Court and the Eleventh Circuit "have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Id.</u> (citations omitted). "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." <u>Id.</u> "Words complimenting appearance may merely state the obvious, or

they may be hopelessly hyperbolic.  Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment." <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 583 (11th Cir. 2000) (citing <u>Oncale</u>, 523 U.S. at 81 (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory 'conditions of employment")).

In <u>Mendoza</u>, the court held that the following conduct fell "well short" of the level of either severe or pervasive conduct sufficient to alter the plaintiff's terms or conditions of employment: (1) one instance where the alleged harasser said, "I'm getting fired up"; (2) one occasion on which the alleged harasser rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; (3) two instances in which the alleged harasser made a sniffing sound while looking at the plaintiff's groin area and one instance of sniffing without looking at her groin; and (4) the alleged harasser's 'constant' following and staring at Mendoza in a 'very obvious fashion.' <u>Mendoza</u>, 195 F.3d at 1247.  The court noted that "although 'following and staring' can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees." <u>Id.</u> at 1248.  The court held that the instances of alleged harassment "occurred over an eleven-month period and therefore were far too infrequent to alter the conditions under which [the plaintiff] was required to perform her job." <u>Id.</u> at 1249.  <u>See also Gupta</u>, 212 F.3d 571 (court found the following behavior by the alleged harasser to not constitute harassment:  suggesting lunch at Hooters; inviting a member of the opposite sex to a group dinner at a bar; telling the plaintiff she was looking very beautiful; calling frequently but never in an intimidating, threatening or sexually explicit manner; unbuckling

16

his belt and pulling down his zipper to tuck his shirt in in front of the plaintiff; and, staring at the plaintiff twice, touching her ring and bracelet once and repeatedly asking her to lunch); Shepherd v. Comptroller of Public Accounts of State, 168 F.3d 871 (5th Cir. 1999) (conduct court found "boorish and offensive" but not legally cognizable sexual harassment: staring by the alleged harasser; commenting that "your elbows are the same color as your nipples" and "you have big thighs;" standing over the plaintiff's desk on several occasions and attempting to look down her clothing; touching the plaintiff's arm on several occasions; and rubbing one of his hands from her shoulder down to her wrist while standing beside her); Galloway v. General Motors Service Parts Operations, 78 F.3d 1164 (7th Cir. 1996) (calling the plaintiff on several occasions a "sick bitch" had nothing to do with the plaintiff's being a woman or belonging to a different gender from her alleged harasser and therefore was not discrimination *based on* her gender); Burrell v. Crown Cent. Petroleum, Inc., 255 F. Supp.2d 591 (E.D. Tex. 2003) (no sexual harassment where a stripper was allowed into the plant to perform at a retirement party because the plaintiff was not present at the party, did not see the stripper in the refinery, did not complain to anyone about the party or the stripper but several employees that attended the party were discussing the party in the plaintiff's presence and were making inappropriate comments about the stripper such as one the male employees saying that he had a "hard" time concentrating for the rest of the day, emphasizing the word "hard").

In assessing constructive discharge claims, the Court is not to consider a plaintiff's subjective feelings about her employer's actions. Rather, the Court must solely determine whether a reasonable person in the plaintiff's position would be compelled to resign. Brantley v. City of Macon, 2005 WL 1127127, *11 (M.D. Ga. 2005) (citing Doe v. DeKalb

17

County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir.1998) (quoting Steele v. Offshore

Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir.1989))).  "Every job has its frustrations,

challenges and disappointments; these inhere in the nature of work.  An employee is

protected from a calculated effort to pressure him into resignation through the imposition

of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is not,

however, guaranteed a working environment free of stress."  Id.  (citing Bristow v. Daily

Press, Inc., 770 F.2d 1251, 1255 (4th Cir.1985)).

> [T]he threshold for establishing constructive discharge is quite high.  Before
> finding a constructive discharge, the Eleventh Circuit requires pervasive
> conduct by employers and a high degree of deterioration in an employee's
> working conditions.  Thus, to prove constructive discharge, the plaintiff must
> demonstrate a greater severity or pervasiveness of harassment than the
> minimum required to prove a hostile working environment.

Id. at 12 (citations and internal quotations omitted).

Absent a credible threat of retaliation, a plaintiff's subjective fears of reprisal do not

excuse her failure to report discrimination.  Walton v. Johnson & Johnson Services, Inc.,

347 F.3d 1272, 1290-91 (11th Cir. 2003).  "Subjective fears of reprisal may exist in every

case, but, . . . those fears, standing alone, do not excuse an employee's failure to report

a supervisor's harassment."  Id. at 1291.  In Walton, where the alleged harasser never told

the plaintiff that her job was in jeopardy or threaten her with physical harm, the court

concluded the plaintiff "did not reasonably avail herself of the protections afforded by [the

employer's] anti-harassment policies."  Id.

Plaintiff Mitchell has not presented a viable claim of sexual harassment because she

did not suffer a "tangible employment action" or a "constructive discharge" when she

resigned from the Butts County Sheriff's Department.  First, the acts complained of

regarding Major Overbey, although inappropriate for the workplace and extremely uncouth, were neither frequent, severe or physically threatening or humiliating. There were several months between each act. Most of the acts were "mere offensive utterances" which are not actionable under federal law. Title VII is not a federal civility code for the Butts County Sheriff's Department or a code that protects Plaintiff Mitchell from any type of offense whatsoever. Rather, Mitchell is protected from *discrimination* based on a protected characteristic such as gender.

There is no evidence whatsoever that any conduct by Major Overbey "unreasonably interfered" with Mitchell's job performance. She was promoted several times. She was permitted to receive training and to be away from the office for weeks at a time for the training which resulted in her being the only one in the Department with a certification in polygraph testing. Although Plaintiff asserted, very vaguely, that after she rejected Overbey's harassment she experienced an "alteration of her job duties on some occasions,"[5] she does little to expound upon how or when any alteration of her duties, schedule or assignments were in any way *adverse.* Mitchell was never assigned to any particular jobs to which no one else was assigned and never suffered a cut in pay, a demotion or a loss of benefits. She simply has not shown any adverse consequences of her "rejection" of Major Overbey.

Mitchell's choice to resign in order to preserve her disability benefits was not an adverse tangible employment action precluding the Defendants' assertion of the Ellerth/Faragher affirmative defense. See Walton, 347 F.3d at 1281-82 (plaintiff not

---

[5]R. at 71, p. 10.

discharged for any reasons related to her gender but "because she failed to return to work after her short-term disability benefits expired in order to preserve her eligibility for long-term disability benefits").   Plaintiff's resignation was clearly do to her misunderstanding about her eligibility for COBRA benefits.  Plaintiff claims that she believed she would be ineligible for continuing medical benefits under COBRA if she was terminated as opposed to resigning.  This argument is without legal or factual basis.  The federal statutory scheme known as "COBRA" provides for the continuation of medical benefits after an employee leaves their place of employment.  However, benefits are not available to employees who are terminated "by reason of such employee's gross misconduct."  29 U.S.C. § 1163.  There is no evidence that anyone ever threatened to terminate Mitchell for "gross misconduct."  The only thing said in this regard was when Sheriff Pope informed Mitchell that she had used all of her available leave and would have to continue coming to work regularly or face termination.  The miscalculation of everyone's leave was done by Pam Turner, another County employee and a woman who had no apparent connection to any "harassment" by Defendant Overbey.  Plaintiff's one performance evaluation in the record was positive.[6]  There is no evidence that Mitchell had ever experienced any disciplinary problems such that she should have been in fear of losing her job for that reason.  To the contrary, during one period when Mitchell was going through a pretty rough time due to her medical condition, several individuals in the office, including Defendant Overbey, donated

---

[6]R. at 75, Ex. 9: Knowledge of Work - 6 out of 10; Performance Level - 8 out of 10; Quality of Work - 4 out of 10; Physical Fitness - 2 out of 10; Dependability - 8 out of 10; Cooperation 6 out of 10; Attitude - 6 out of 10; Work Habits - 6 out of 10; Judgment - 8 out of 10; Personality - 6 out of 10; Attendance - 4 out of 10.  Her medical problems were noted as being the basis for the lower scores.  The evaluator was Lieutenant Robert Smith.

leave to Mitchell so she would not be penalized for taking additional leave.[7]   Mitchell unreasonably believed that she would be ineligible for benefits upon termination as opposed to a resignation, and a simple inquiry on her part would have cleared up the confusion.

Mitchell's resignation letter clearly set forth that she was resigning due to having exhausted her available paid and unpaid leave.[8]  There is nothing whatsoever in that letter indicating she was resigning due to any harassment by Overbey.  Rather, she knew she had exhausted her leave, knew she would be out of work for a substantial amount of time in the future and be unable to fulfill her employment obligations and therefore felt she must resign to retain her COBRA medical benefits.  This in no way translates to being constructively discharged due to sexual harassment, a hostile work environment or any other type of gender-based discrimination.

Mitchell did not experience a constructive discharge and there is no other evidence of any "adverse employment action" against her.  The Defendants are therefore entitled to assert the Ellerth/Faragher affirmative defense.  That is, the Defendants were required to and did set forth facts showing the Sheriff exercised reasonable care to prevent and correct promptly any sexually harassing behavior and that Plaintiff Mitchell unreasonably failed to take advantage of any preventive or corrective opportunities provided by the Sheriff or to avoid harm otherwise.

In response to this defense, Plaintiff Mitchell claims that she did not file a formal

---

[7]R. at 64 (Plf.'s Dep.) at 160; R. at 39, Ex. B (Overbey Dep.) at 107.

[8]R. at 54, Ex. B.

complaint or complain to the Sheriff because she felt that it would be fruitless considering the friendship between Pope and Overbey. This argument fails. First, the Sheriff's Department clearly took complaints of sexual harassment and/or discrimination seriously. Immediately upon Mitchell's complaining about Deputy Bennett, an investigation was conducted and the Sheriff referred the matter to the Georgia Bureau of Investigation.[9] Mitchell thereafter experienced no adverse employment actions based on that complaint. After Bennett was scheduled for a polygraph, he admitted his misconduct. The Sheriff then spoke with Plaintiff Mitchell about possible punishment for Bennett to which Mitchell responded that she simply wanted a written apology and for nothing to happen again. The Sheriff accepted this recommendation and also required Bennett to undergo counseling.

Mitchell contends that one of the individuals to whom she complained on several occasions was Lt. Robert Smith. However, after Mitchell complained to Smith, she asked him to take no action against Overbey. She also stated that she did not wish to speak to Overbey about the matter with Smith. Smith stated that he felt he needed Mitchell to either file a complaint or at least accompany him to speak to Overbey or the Sheriff. When Mitchell refused to do so, Smith felt that he could not pursue the matter further.[10]

"The employer's size, location, geographic scope, organizational structure, and industry segment are just some of the characteristics that impact the analysis of whether the complaint procedures of an employer's anti-harassment policy adequately fulfill Title

---

[9]R. at 80, Ex. 1.

[10]R. at 75, Ex. 7 (Smith. Dep.) at 53-54. This is the citation to the deposition given Sheriff Pope in his reply brief. However, the entire deposition has not been filed and the portions of the deposition that were filed do not contain these page numbers. Because Plaintiff Mitchell has not in any way disputed this portion of his testimony, the Court will accept the presentation of this testimony as accurate.

VII's deterrent purpose.  At a minimum, employers must establish a complaint procedure designed to encourage victims of harassment to come forward without requiring a victim to complain first to the offending supervisor." Walton, 347 F.3d at 1286.  Sheriff Pope had in place a clear policy regarding how to report harassment or other forms of discrimination. The Sheriff testified that the employment manual explains how an employee could file a grievance.  The employee could also bring the matter to the attention of the individuals in the employee's chain of command.  The Sheriff stressed that an employee simply needed "to open their mouth and say something, or follow the grievance procedure.  That's the only two things we've got."[11]  Plaintiff Mitchell presented no evidence whatsoever that she followed the grievance procedure or that there was any reason to believe the grievance procedure would not be followed by the individuals in her chain of command.  Considering the small size of the Department and the organizational structure therein, the procedures in place for Mitchell to have complained were more than sufficient yet she failed to utilize the opportunities provided.  Plaintiff's "hostile work environment" sexual harassment claims are therefore dismissed with prejudice.

### Equal Pay Act Claim

Plaintiff Mitchell is not permitted to bring an Equal Pay Act claim against Sheriff Pope in his individual capacity or Major Overbey in his official or individual capacity pursuant to Welch v. Laney, 57 F.3d 1004, 1010 (11th Cir. 1995).  Because the County has been dismissed, the Court will not consider an Equal Pay Act claim against the County. From the facts presented, it appears that Sheriff Pope qualifies as Mitchell's former

---

[11]R. at 39, Ex. A (Pope Dep.) at 36.

"employer" because Mitchell's employment took place on the premises of the Sheriff's Department; the Sheriff exerted complete, or nearly complete, control over the Department's employees; and, the Sheriff had the power to fire, hire, or modify the employment condition of the employees of the Department.  Therefore, the only Equal Pay Act claim that may go forward is the claim against Sheriff Pope in his official capacity as Plaintiff Mitchell's "employer."  Id.[12]

"An employee demonstrates a prima facie case of an Equal Pay Act violation by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions."  Steger v. General Elec. Co., 318 F.3d 1066, 1077-78 (11th Cir.) (citations omitted).   "Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) any other factor other than sex.'"  Id. at 1078 (citing 29 U.S.C. § 206(d)(1)).   "The burden to prove these affirmative defenses is heavy and must demonstrate that the factor of sex provided no basis for the wage differential."  Id. (citations omitted).   "Although an employer may not rely on a 'general practice' as a factor 'other than sex,' it may consider factors such as the 'unique characteristics of the same job; an individual's experience, training or ability; or special exigent circumstances connected with the business.'"  Id. (citations omitted).   "Once the

---

[12]It is far from clear how the concepts of "individual capacity" and "official capacity" discrimination suits should now proceed in light of sheriffs being considered state actors pursuant to Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).

employer's burden is met, the employee 'must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.'" Id. (citations omitted).

"Any other factor other than sex 'is a general exception to application of the EPA.'" Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995) (citations omitted). "In the past, we have found that such factors include 'unique characteristics of the same job; an individual's experience, training or ability; or special exigent circumstances connected with the business.'" Id. "[A]n Equal Pay Act defendant may successfully raise the affirmative defense of 'any other factor other than sex' if he proves that he relied on prior salary and experience in setting a 'new' employee's salary. While an employer may not overcome the burden of proof on the affirmative defense of relying on 'any other factor other than sex' by resting on prior pay alone  . . . , there is no prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay and more experience." Id. The question is whether other business reasons reasonably explain the utilization of prior salary such as experience with the division. Id. at 955-56. "Experience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender." Id. at 956.

Plaintiff Mitchell alleges that three male officers were paid more than she was in violation of the Equal Pay Act: Keith Kendrick, Rod Whitehead and T.J. Jackson.  Keith Kendrick was hired in 1997 at the rate of $9.64 per hour.  In setting Kendrick's wage rate, the Sheriff considered Kendrick's previous wage rate with Henry County ($12.08 per hour), his certifications as a Jailer and Basic Law Enforcement Officer and the Butts County

Sheriff's Department's needs to recruit and retain qualified employees.[13]  Rod Whitehead was a Lieutenant in the Butts County Sheriff's Department.  His prior experience included serving in the Army from 1973 to 1975, working with the Forsyth Police Department from 1975 to 1980 and working as a law enforcement officer with the Georgia Department of National Resources from 1980 to 1993.[14]  T.J. Jackson had 10 years of previous experience in investigations with the City of Jackson and served as a military police officer before joining the Sheriff's Department.

Although Plaintiff Mitchell was hired in the Criminal Investigation Division several months prior to Jackson and Whitehead, Jackson, Whitehead and Kendrick all had more law enforcement experience from previous jobs than did Plaintiff Mitchell.  Plaintiff Mitchell had only worked as a law enforcement officer for a brief period of time compared to these three men.  In the context of this particular area of employment, this distinction is crucial to the requirements and needs of the Department, and the safety of the public in general.  More importantly,  Plaintiff Mitchell pointed to no evidence that she was paid less *because of* her gender.  The Sheriff was therefore not in violation of the Equal Pay Act when he paid Jackson, Whitehead and Kendrick more than was paid to Plaintiff Mitchell during the times in question.

### First Amendment Free Speech Claim

This circuit employs a four-part test to determine whether a government employee was retaliated against based on their speech.  "First, a court must determine whether the

---

[13]R. at 54, Ex. E, F.

[14]R. at 54, Ex. G.

employee's speech may be fairly characterized as constituting speech on a matter of public concern." Rice-Lamar, 232 F.3d at 841 (citations omitted).  "Second, a court must weigh the employee's First Amendment interests against the interest of the . . . employer, in promoting the efficiency of the public services it performs through its employees." Id. (citation omitted).  "Third, a court must determine whether the speech in question played a 'substantial part' in the government's decision to discharge the employee." Id.  "Fourth, if the employee shows that the speech was a substantial motivating factor in the decision to discharge him, the [employer] must prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct." Id. (citation omitted).

Plaintiff Mitchell's First Amendment "free speech" claim fails because her allegedly protected speech - the verbal complaints about Overbey - was not regarding a matter of public concern. See Maggio v. Sipple, 211 F.3d 1346 (11th Cir. 2000) (Complaints about sexual harassment by public employees do not constitute matters of public concern.); Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993) (speech not on a matter of public concern when it is driven by the plaintiff's own entirely rational self-interest in improving the conditions of her employment).  Second, Plaintiff's "speech" consisted only of conversations with other individuals who worked in the Sheriff's Department.[15]  Plaintiff never made a complaint in writing and never in any other way publicized her complaints about Major Overbey.  Plaintiff Mitchell was therefore only complaining in an attempt to improve her employment situation and not to bring to light some matter of concern to the community.  More importantly,

---

[15]R. at 64 (Plf.'s Dep.) at 192-202.

Plaintiff Mitchell was never demoted, discharged or in any other way subjected to an adverse employment action as a result of any of her verbal complaints.  Because the Plaintiff failed to show that her speech was a matter of "public concern," the Court need not address the other factors set forth above.  Maples v. Martin, 858 F.2d 1546, 1552 (11th Cir. 1988).  Plaintiff Mitchell's First Amendment "Free Speech" Claims are dismissed with prejudice.

### Americans With Disabilities Act Claim

Plaintiff's ADA claims against the Defendants in their individual capacities are dismissed pursuant to Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir.1996) (no individual liability under the ADA).  Because Defendant Overbey was not Mitchell's "employer," he may not be sued pursuant to Title I of the ADA but the claims against the Sheriff in his capacity as Mitchell's employer will be considered.  Id.  Plaintiff Mitchell concedes that Sheriff Pope is a state actor in this regard and as such any ADA claims against him for monetary damages must be dismissed.  See Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) (the sheriff is now considered a state actor); Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 374 n.9, 121 S. Ct. 955 (2001) (Title I of the ADA can be enforced by the United States in actions for money damages or by private individuals in actions for injunctive relief).  Therefore, the only ADA claims that may be pursued by Plaintiff Mitchell are claims against the Sheriff as her former employer for injunctive relief. Because Mitchell resigned from her employment, she has not shown how injunctive relief would be available to her but the Court will nonetheless examine her ADA claim.

Plaintiff Mitchell must show that: (1) she is disabled; (2) she was a 'qualified individual' at the relevant time, meaning she could perform the essential functions of the

28

job in question with or without reasonable accommodations; and (3) she was discriminated against because of her disability.  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted).

Even if Plaintiff were able to bring her ADA claims against the Defendants in this case, her claims have no merit because she has not even established a prima facie case of disability discrimination.  "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability – unless doing so would impose undue hardship on the employer."  Id. (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).  "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job."  Id. (citation omitted).  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."  Id. at 1255-56 (citations omitted).

Although the Defendants do not dispute that Mitchell's arthritis and Beurger's disease are disabling conditions, Mitchell was not a 'qualified individual' at the relevant time because she could not perform the essential functions of the job in question with or without a reasonable accommodation.  Plaintiff Mitchell was an investigator and had to be able to investigate crimes as they occurred.  In order to do that, she had to be present, a requirement with which she had begun to have a recurring problem.  See Cantrell v. Delta Airlines, Inc., 2 F. Supp.2d 1460, 1465 (N.D. Ga. 1998) (summary judgment for employer in ADA case because flight attendant with chronic absenteeism allegedly caused by asthma was not qualified to perform her duties dependably).  Considering Plaintiff's need to be out at least once every eight weeks and periodically for "flare ups," her medical

29

condition would have prevented her from being able to respond to and investigate crimes as they happened. Further, there is no evidence that Defendants failed to provide a reasonable accommodation that would have enabled Plaintiff to better perform her job. Plaintiff never requested any type of accommodation other than to be out of work beyond her available leave time. There is no evidence of vacant positions to which she could have been transferred or of light duty assignments to which she could have been assigned. Plaintiff therefore would have a viable ADA claim only if she could show that other individuals were granted accommodations that she was not.

Plaintiff Mitchell contends that the following employees in the Sheriff's Department received more liberal leave than she did: Harold Wilmot who had a gambling problem and frequently went to Biloxi; Robby Neal who had an alcohol problem and went to rehabilitation; Scott Whitwell who was out for approximately a year with health problems; and, Sandra Thurston who had chronic rheumatoid arthritis and was frequently absent. Mitchell failed to more specifically allege how these individuals received better or more lenient treatment than she did regarding leave. In the Sheriff's deposition,[16] he explained that Whitwell was out for the entirety of his FMLA leave time then resigned when his workers compensation benefits were denied. The Sheriff was very liberal in granting Mitchell leave to tend to her medical problems. Mitchell began the 2002 calendar year with a deficit of more than 70 leave hours yet she was granted an additional 15 weeks of leave which is 3 weeks more than the 12 weeks mandated by the FMLA. The Sheriff informed Mitchell that she could take leave intermittently to accommodate her doctor's appointments

---

[16]R. at 39, Ex. A (Pope Dep. at 50).

and any other time she needed to be out of work because of her medical condition. Plaintiff declined this invitation and decided instead to resign.  There was simply nothing more the Sheriff could have done that would have enabled Plaintiff to fulfill her job responsibilities.  Further, there is no evidence the Sheriff discriminated against Mitchell *because of* her disability.  Defendants are therefore entitled to summary judgment on Plaintiff's ADA claims.

### *Retaliation Claim*

"To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed."  Gupta, 212 F.3d at 586 (citations omitted).  "In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements:  (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision."  Id. at 587 (citation omitted).  Employers are prohibited from retaliating for any action alleging discrimination, whether it was brought under Title VII or another act of Congress.  Wu v. Thomas, 863 F.2d 1543, 1546 n.5 (11th Cir. 1989).  Therefore, the retaliation provisions of 42 U.S.C. § 2000e "encompass suits brought to remedy retaliatory action resulting from the prosecution of a claim under the Equal Pay Act."  Id.

Mitchell never complained to Sheriff Pope about any of the conduct that now forms the basis of this lawsuit, nor did she file a grievance against Overbey or Pope with any other individual or office.  Neither is there information that Sheriff Pope was notified by anyone that Plaintiff Mitchell felt harassed by Major Overbey.  Plaintiff Mitchell therefore

could not have been retaliated against for "opposing an unlawful employment practice." Second, Plaintiff Mitchell resigned on August 14, 2002. She filed the EEOC Charge on August 28, 2002. She therefore could not have been retaliated against for filing the EEOC Charge. As explained above, even if the Court assumed that Mitchell participated in a protected activity when she complained to other individuals in the Sheriff's Department, she did not suffer an "adverse employment action" because she was not "constructively discharged" after any "complaints." Finally, even if the Court accepted Mitchell's arguments that she was constructively discharged, there is no causal, or even logical, connection between her "complaining" about Major Overbey and her resigning from the Sheriff's Department based on her medical condition and her assumptions about the continuation of COBRA coverage. The Defendants are entitled to summary judgment on Plaintiff Mitchell's retaliation claim.

### Section 1985 Conspiracy Claim

Plaintiff Mitchell alleged that the Defendants conspired to violate her rights secured by federal statutes and the Constitution. However, the disposition of Mitchell's various claims as set forth above obviates the need to address her conspiracy claims pursuant to 42 U.S.C. § 1985. Rice-Lamar, 232 F.3d 836, 844 n.13. The § 1985 claims are therefore dismissed.

### Conclusion

In addition to the above findings, Defendants Pope and Overbey are entitled to qualified immunity on the claims brought against them in their individuals capacities pursuant to 42 U.S.C. § 1983 because Plaintiff failed to establish a violation of any of her

constitutional rights.[17] <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S. Ct. 2508 (2002).  The claims against the Defendants in their official capacities are in effect claims against the entity of which the officers are agents pursuant to <u>McMillian v. Monroe County, Ala.</u>, 520 U.S. 781, 785 n.2, 117 S. Ct. 1734 (1997).  As such, the claims brought against the Defendants in their official capacities are barred by Eleventh Amendment immunity.  <u>Regents of the University of California v. Doe</u>, 519 U.S. 425, 117 S. Ct. 900 (1997); <u>Manders v. Lee</u>, 338 F.3d at 1328 (11th Cir. 2003).  Because there is no merit to the underlying claims, the request for injunctive relief pertaining to the claims brought pursuant to 42 U.S.C. § 1983 is denied.  <u>Wu v. Thomas</u>, 863 F.2d at 1550.  Defendants' motion to dismiss and motion for summary judgment are GRANTED.

Because the Court has dismissed all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over Plaintiff Mitchell's state law claims.  <u>See</u> 28 U.S.C. § 1367(c)(3).  Plaintiff's state claims are therefore dismissed without prejudice.

**SO ORDERED this 17th day of August, 2005.**


**S/Wilbur D. Owens, Jr.**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[17]Additionally, any claims brought pursuant to § 1983 regarding acts that occurred prior to May 16, 2001, two years prior to this case being filed, are barred by the two-year statute of limitations.  <u>Giles v. Garwood</u>, 853 F.2d 876, 877 (11th Cir. 1988).